United States District Court
Southern District of Texas
ENTERED
November 08, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:24-CV-3021 |
| | § | |
| MEGA WORLD BUILDER CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a motion for a preliminary injunction filed by Plaintiff Bank of America, N.A. ("Bank of America"). The Court held an evidentiary hearing on the motion on September 3, 2024; September 9, 2024; and September 12, 2024. (Dkt. 18; Dkt. 26; Dkt. 37). After careful consideration of the parties' written submissions, the evidentiary record developed at the hearing, and the other filings in the case, Bank of America's motion (Dkt. 1 at pp. 15–17; Dkt. 44 at p. 2) is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Bank of America has sued Defendants Mega World Builder Corp. ("Mega World") and Mahir Nasif ("Nasif"), who is Mega World's Chief Executive Officer, for breach of several loan agreements (Counts I–III and VII of Bank of America's complaint), foreclosure of a security interest under Article 9 of the Uniform Commercial Code (Count IV), conversion (Count V), and unjust enrichment (Count VI). (Dkt. 1 at pp. 10–15). In its verified complaint, Bank of America alleges that, "[o]n or about May 9, 2024, [Mega

World] provided to [Bank of America] a purported lien release letter purported to be from Regions Bank and allegedly signed by Regions Bank Vice President Thomas J. Bacarella . . . in an attempt to convince [Bank of America] that, among other things, Regions Bank does not hold a lien upon the same collateral pledged by [Mega World] to [Bank of America]." (Dkt. 1 at pp. 6–7). Bank of America further alleges that the May 9, 2024 letter "is not true, correct or legitimate, and Mr. Bacarella's signature was forged, constituting a default" under the loan agreements between Bank of America and Mega World. (Dkt. 1 at p. 7). In subsequent briefing, Bank of America alleges that it "has discovered an additional fraudulent letter purportedly issued by Regions Bank," this one dated May 2, 2024, "which was also submitted to [Bank of America] by Defendants" and was also allegedly signed by Bacarella. (Dkt. 22 at p. 4).

Moreover, Bank of America also alleges that, "[d]espite repeated requests, [Mega World] has failed and refused to allow [Bank of America] to inspect certain collateral," specifically "a 2020 Trencor Trencher T16-60, Serial Number T16-187" and "a 2022 Vermeer Drill D330X500, Serial Number 1VR450075E1099684" ("the trencher and the drill"). (Dkt. 1 at pp. 5, 8). Bank of America contends that Mega World's refusal to allow inspection of the trencher and the drill constitutes an additional default under the relevant loan agreements. (Dkt. 1 at p. 8).

Based on these and other alleged defaults, Bank of America has sent Mega World and Nasif a notice of acceleration. (Dkt. 1-13). In its request for a preliminary injunction, Bank of America seeks an order:

a. Enjoining and restraining Defendants, and each of their officers, directors, shareholders, employees and representatives from:

   i. Hiding, secreting, moving, transferring or removing from the jurisdictional limits of this Court and/or from Harris County, Texas, or any other County where such items are located, any of the Collateral;

   ii. Removing, damaging, destroying, hiding, or secreting any of the Collateral.

b. Immediately identifying to counsel for the Bank the specific location of all Collateral.

c. Mandatorily enjoining and directing Defendants, and each of their officers, directors, shareholders, employees and representatives, to immediately deliver to the Bank possession of the Collateral.

Dkt. 1 at pp. 16–17.

In its subsequent briefing, Bank of America requests "an Order compelling Defendants, or any third-parties affiliated with or working in concert with the Defendants, to provide Bank of America immediate access to the [trencher and the drill] for inspection, and to authorize the U.S. Marshal to take all necessary measures to enforce the Order (and turnover of the [trencher and the drill], if so ordered by the Court) using such force as may be necessary." (Dkt. 44 at p. 2).

The Court has granted Bank of America's application for a writ of sequestration regarding the trencher and the drill and has further indicated that it will compel Mega World to allow Bank of America to inspect its collateral if Mega World will not allow such

an inspection on its own. (Dkt. 9; Dkt. 37). However, according to Bank of America, Mega World insists on attaching numerous "inappropriate" conditions to the inspections and refuses "to provide even a single photo of the [trencher and the drill] and serial numbers," which, Bank of America contends, "raises the distinct possibility that the fraud in this matter is even worse than [Bank of America] is currently aware of—including that the [trencher and the drill] may not even exist." (Dkt. 44 at p. 1). Mega World does not deny that it is refusing to comply with Bank of America's requests for an inspection or photographs and instead insists that venue is not proper in this Court and that the Court lacks subject matter jurisdiction. (Dkt. 45).

## II. THE LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). In the Fifth Circuit, the following well-established framework generally governs the determination of whether to grant a preliminary injunction:

> To be entitled to a preliminary injunction, the movant must satisfy each of the following equitable factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest. Because a preliminary injunction is an extraordinary remedy, it should not be granted unless the movant has clearly carried the burden of persuasion on all four requirements. Failure to sufficiently establish any one of the four factors requires this Court to deny the movant's request for a preliminary injunction.
> *Id*.

The requirements for obtaining a preliminary injunction are stringent in all cases, but "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

In presiding over a preliminary injunction hearing, a district court may "give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be held[.]" *Federal Savings & Loan Insurance Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (quoting 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2949 at 471). In particular, "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding." *Dixon*, 835 F.2d at 558 (quoting *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986)).

## III. ANALYSIS

Bank of America has carried its burden of persuasion on all four of the required elements.

### a. Substantial likelihood of success on the merits

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C.*

*v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). "To assess the likelihood of success on the merits, [courts] look to standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quotation marks omitted). When the plaintiff has brought multiple causes of action, he need only present a prima facie case on one of them. *Kalsi Engineering, Inc. v. Davidson*, No. 4:14-CV-1405, 2014 WL 12540550, at *2 & n.2 (S.D. Tex. Sept. 2, 2014); *Texas v. U.S.*, 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015); *see also Butler v. Alabama Judicial Inquiry Commission*, 111 F. Supp. 2d 1224, 1230 (N.D. Ala. 2000) ("Under the first requirement for obtaining a temporary restraining order, the court does not have to find that Plaintiffs have a substantial likelihood of success on every claim set forth in their Complaint."). Bank of America has clearly shown a substantial likelihood of success on the merits of at least one claim.

*1. Breach of the revolving line of credit loan agreement*

Bank of America has asserted a cause of action for breach of a revolving line of credit loan agreement ("RLOC") between Bank of America and Mega World (Dkt. 1 at pp. 10–11), and Bank of America has clearly shown a substantial likelihood of success on the merits on that cause of action.

The RLOC provides that it is governed by Texas law and that Bank of America may file a lawsuit "arising out of or relating to" the RLOC in Texas state or federal courts. (Dkt. 1-1 at p. 13). "In Texas, breach of contract requires four elements: (1) a valid contract, (2) plaintiff's performance, (3) defendant's breach, and (4) resulting damages." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 993 (5th Cir. 2019). "To determine the meaning of contractual terms, Texas courts focus on the parties' intentions as expressed in

the contract itself." *Id.* The Court begins its analysis with the contract's express language. *El Paso Field Services, L.P. v. MasTec North America, Inc.*, 389 S.W.3d 802, 805–06 (Tex. 2012). If the Court determines that the contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and the Court will construe it as a matter of law. *Id.* at 806.

The parties do not contest that the first two elements are met. As to the breach element, the RLOC allows Bank of America to "require [Mega World] to repay its entire debt immediately" upon default. (Dkt. 1-1 at p. 12). Bank of America has provided Mega World with a notice of acceleration, and Mega World has neither repaid the loan nor turned over the pledged collateral. (Dkt. 1-13). Accordingly, if Mega World has defaulted on the RLOC, then Mega World is in breach of the RLOC.

The RLOC contains extensive provisions defining what constitutes a default. At least two of those provisions are particularly relevant to Bank of America's request for a preliminary injunction. The first provision stipulates that Mega World has defaulted on the RLOC if it "has given [Bank of America] false or misleading information or representations." (Dkt. 1-1 at p. 12). The second provision stipulates that Mega World has defaulted on the RLOC if: (1) "[a]ny default occurs under any other document executed or delivered in connection with [the RLOC], including without limitation, any note, guaranty, subordination agreement, mortgage or other collateral agreement[;]" or (2) more broadly, if "any default occurs under any other agreement [Mega World] has with [Bank of America]." (Dkt. 1-1 at p. 12).

—False or misleading information

With regard to the RLOC's "false or misleading information" default provision, Bank of America alleges that Mega World presented two forged letters to Bank of America "in an attempt to convince [Bank of America] that Regions Bank does not hold a first lien position on the same collateral pledged by [Mega World] to [Bank of America]." (Dkt. 1 at p. 3; Dkt. 22 at p. 4). Bank of America has presented strong evidence supporting its allegations.

Bank of America's evidence shows that it received two letters, one dated May 2, 2024 and the other dated May 9, 2024, purporting to be lien release letters signed by Thomas Bacarella, a Vice President at Regions Bank ("the Bacarella letters"). (Dkt. 22-2 at pp. 2–3, 12–14, 16–20). The Bacarella letters were attached to emails that were evidently sent by Nasif in response to Bank of America's requests for a Disclaimer of Security Interest executed by Regions Bank. (Dkt. 22-2 at pp. 12–20). For example, Nasif sent the May 9, 2024 letter in response to an email from Arti Patel ("Patel"), a Vice President at Bank of America, when Patel asked for a Disclaimer of Security Interest from Regions Bank:


MN M. Nasif <megaworldbuilders@gmail.com> Wednesday, May 29, 2024 at 4:45 PM
To: Patel, Arti
release letter.pdf
244.6 KB
Download • Preview

I sent you this one before.

On Wed, May 29, 2024 at 1:56 PM Patel, Arti <arti.r.patel@bofa.com> wrote:

> We can also accept a Disclaimer of Security interest as well on our collateral. They UCC doesn't have to be terminated. I was just under the impression that he was terminating all of them.

Dkt. 22-2 at pp. 3, 16.

Patel then forwarded the May 9, 2024 letter to Jeff Guillory ("Guillory"), a Senior Vice President at Bank of America, when Guillory asked Nasif for a Disclaimer of Security Interest from Regions Bank:



release letter.pdf
244.6 KB

Download · Preview

**Arti R. Patel**
VP, Relationship Manager
Commercial Banking

BANK OF AMERICA
800 Capitol St, Ste 1660,
Houston, TX 77002
T: 713-247-6630 | M: 281-908-0292
arti.r.patel@bofa.com

**From:** Patel, Arti <arti.r.patel@bofa.com>
**Sent:** Wednesday, May 29, 2024 4:53 PM
**To:** Guillory, Jeff <jeff.guillory@bofa.com>; M. Nasif <megaworldbuilders@gmail.com>
**Subject:** RE: Mega World

Jeff.

Can you review this Mahir had provided a long back and I had missed it

Thanks.

Arti.

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Guillory, Jeff <jeff.guillory@bofa.com>
**Date:** Wednesday, May 29, 2024 at 4:50 PM
**To:** M. Nasif <megaworldbuilders@gmail.com>
**Cc:** Patel, Arti <arti.r.patel@bofa.com>
**Subject:** FW: Mega World

Hi Mahir,

Can you have Regions sign the attached Disclaimer? This is for the two UCC filing having to do with their equipment loans. It just states that they don't have an interest in the equipment that we are financing. If they have any questions please have them reach out to me directly. Thanks!

Thanks,

Dkt. 22-2 at p. 3, 19.

Here is the full text of the May 9, 2024 letter:



May 9, 2024

MEGA World Builder Corp.
12604 Haynes Rd.
Suite A
Houston, Texas 77066
Attention: Mahir Nasif, President:

Re: That one certain $2,000,000.00 revolving line if credit loan ("Loan") made by Regions Bank ("Lender") to MEGA World Builder Corp., a Florida corporation ("Borrower") pursuant to that one certain Loan Agreement date October 18, 2021 ("Loan Agreement"), which Loan is more fully described in that one certain U.S. Small Business Administration Note dated October 18, 2021 ("Note"), which Note is payable to the order of Lender in the original principal amount of $2,000,000.00 ("Note"), the payment and performance of which Note being guaranteed by Mahir Nasif ("Guarantor") pursuant to the terms of that one certain U.S. Small Business Administration Unconditional Guaranty dated October 18, 2021 ("Guaranty").

As you know from our previous discussion, I am the Regions Bank officer handling the Borrower's loan relationship. In that regard I have received Borrower's request to release the UCC-1 filing 202109293153 / 202203375572 which was filed on 5/7/2024 to be released.

Let me assure you, Lender is no longer holding the ABA on MEGA World Builder Corp., and should see the release reflect in a timely matter. The loan has been paid in full and no longer active in our system. Please allow 4 to 6 weeks for the release to reflect in the system.

I hope this clarifies this situation. We look forward to hearing from you regarding this issue.

Very truly yours,

REGIONS BANK

By: ______________________
Name: Thomas J. Bacarella
Title: Vice President

Dkt. 22-1 at p. 8.

The record contains compelling evidence showing that the Bacarella letters were forgeries designed by Nasif to mislead Bank of America regarding the status of Regions Bank's liens. Bacarella himself has testified, both by affidavit and in open court, that he neither wrote the Bacarella letters nor authorized the use of his signature on the Bacarella letters. (Dkt. 22-1 at pp. 2–3). Moreover, Bacarella has further testified that "Regions Bank has loans outstanding to [Mega World] that have not been repaid" and that "Regions Bank has not released its UCC liens against [Mega World]"—in other words, that the representations contained within the Bacarella letters about the status of Regions Bank's liens are false. (Dkt. 22-1 at p. 3).

For his part, Nasif denied on the witness stand that the Bacarella letters are forgeries and denied sending the May 9, 2024 letter to Bank of America at all. Those denials may create a genuine issue of material fact for trial, but Bank of America need not prove that it is entitled to summary judgment in order to obtain a preliminary injunction. *See Daniels Health Sciences*, 710 F.3d at 582. Rather, Bank of America must present a prima facie case that Mega World provided it with false or misleading information, and it has satisfied that standard.

—<u>Default under other documents or agreements</u>

Bank of America can also ground its claim for breach of the RLOC on another default provision. The RLOC stipulates that Mega World has defaulted on the RLOC if: (1) "[a]ny default occurs under any other document executed or delivered in connection with [the RLOC], including without limitation, any note, guaranty, subordination agreement, mortgage or other collateral agreement[;]" or (2) more broadly, if "any default

occurs under any other agreement [Mega World] has with [Bank of America].” (Dkt. 1-1 at p. 12).

With regard to this default provision, Bank of America alleges that Mega World refuses to allow Bank of America to inspect the trencher and the drill, which constitutes a violation of a security agreement (“the security agreement”) that Bank of America and Mega World executed contemporaneously with the RLOC. (Dkt. 1 at p. 8). The security agreement grants Bank of America a security interest in “the following described property now owned or hereafter acquired by” Mega World:

> (a) All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account.
>
> (b) All inventory.
>
> (c) All equipment and fixtures now owned or hereafter acquired by the Pledgor, (including, but not limited to, the equipment described in the attached Equipment Description, if any).
>
> (d) All negotiable and nonnegotiable documents of title covering any Collateral.
>
> (e) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.
>
> (f) All substitutes or replacements for any Collateral, all cash or non-cash proceeds (including insurance proceeds), products, rents and profits of the Collateral, and all income, benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral.
>
> (g) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory ("Books and Records").

Dkt. 1-2 at p. 2.

The security agreement defines the above-listed items as “the Collateral” and specifically requires Mega World “to permit [Bank of America] to inspect the Collateral at any time[.]” (Dkt. 1-2 at pp. 2–3). Failure by Mega World to comply with its obligation to permit inspection of “the Collateral” constitutes a default under the security agreement.

(Dkt. 1-2 at pp. 2–4). In short, if Mega World is refusing to allow Bank of America to inspect the trencher and the drill, then Mega World is in default under the RLOC.

At this point, it would be hard for Mega World to credibly deny that it has defaulted under these provisions; the Court itself has witnessed Mega World's intransigence—which reached absurd proportions during and after the injunction hearing—in the face of Bank of America's repeated and reasonable requests for an opportunity to inspect the trencher and the drill. In light of the compelling evidence of forgery and dishonesty that it has presented, Bank of America represents that, fundamentally, it just wants to make sure that the trencher and the drill actually exist and are where Mega World says they are. (Dkt. 31 at p. 3; Dkt. 32 at p. 3). To that end, Bank of America has proposed that, until the parties can schedule an inspection, Mega World simply provide pictures of the trencher and the drill at their current locations, along with pictures of the serial numbers to see if those numbers match the ones that Mega World has previously given Bank of America. (Dkt. 32 at p. 3). Mega World refuses to provide those pictures, which the Court finds both remarkable and troubling.

Mega World insists that the client for which it is working will not allow Bank of America's inspectors to enter the jobsite to inspect the trencher and the drill unless Bank of America provides proof of liability insurance and copies of the inspectors' government-issued identification. (Dkt. 32 at p. 7). The Court explained to Mega World and Nasif at the injunction hearing that it will not allow them or their client to place such conditions on the unqualified contractual language that is now before the Court. (Dkt. 37). The inspection provision of the security agreement is broad and unequivocal, and Bank of America merely

seeks to enforce that provision for one of the very purposes—confirming the presence and condition of pledged collateral—for which the provision was drafted. To say the least, Bank of America has presented a prima facie case that Mega World has refused to permit Bank of America to inspect its collateral and is accordingly in default under the security agreement and the RLOC.

—Resulting damages

The fourth element of a breach-of-contract claim under Texas law is damages resulting from the breach. *Wease*, 915 F.3d at 993. The parties do not appear to contest that this element is satisfied. In any event, the Court concludes that Bank of America has presented sufficient evidence, through its verified complaint, to establish that the outstanding balance on the RLOC is over $4 million. (Dkt. 1 at p. 11; Dkt. 1-13 at p. 4). The combined value of the trencher and the drill is roughly $3.7 million. (Dkt. 1 at p. 18; Dkt. 1-16).

Bank of America has clearly shown a substantial likelihood of success on the merits on at least one cause of action.

**b. Threat of irreparable injury**

Bank of America has also clearly shown a substantial threat of irreparable injury.

Generally, "[t]he extraordinary equitable remedy of an injunction requires that the [movant] demonstrate that, without injunctive relief, he will suffer an irreparable injury for which damages are an inadequate remedy." *Jones v. American Council on Exercise*, 245 F. Supp. 3d 853, 867 (S.D. Tex. 2017) (quotation marks omitted). "[T]he injury at issue must be actual and imminent, not speculative or remote." *Allied Home Mortgage Corp. v.*

*Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011). "However, the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Janvey*, 647 F.3d at 600. "[E]xtraordinary circumstances—such as evidence showing that the defendant is likely to become insolvent before final judgment or that the defendant intends to dissipate his assets to make a judgment awarding damages uncollectible—may give rise to the irreparable harm required for a preliminary injunction." *Amegy Bank N.A. v. Monarch Flight II, LLC*, No. 4:11-CV-3218, 2011 WL 6091807, at *6 (S.D. Tex. Dec. 7, 2011) (quotation marks omitted). When the dissipation of assets that are the subject of a lawsuit would impair the district court's ability to grant an effective remedy at the conclusion of the case, the district court may enter a preliminary injunction to protect against those assets' dissipation. *Janvey*, 647 F.3d at 600–01; *see also Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980) ("[E]ven were [the plaintiff's] remedy limited to damages, an injunction may issue to protect that remedy.").

Bank of America has presented sufficient evidence to show that asset dissipation and Defendants' ability to pay a money judgment are genuine concerns in this case. The Court discussed much of that evidence earlier in this opinion. As previously noted, Defendants have not tendered payment in response to Bank of America's notice of acceleration; and Defendants refuse even to provide a picture of the trencher and the drill, two large pieces of pledged collateral that are securing millions of dollars in loans. Bank of America is concerned that the trencher and the drill do not even exist—and with good reason, considering Bank of America has a valid evidentiary basis for contending that

Defendants misrepresented the status of liens held by Regions Bank on Bank of America's collateral by forging lien-release letters from Regions Bank.

Bank of America has proffered additional evidence supporting its claim that it will suffer irreparable harm absent preliminary injunctive relief. According to bank statements provided by Defendants to Bank of America, Mega World had over $30 million in a checking account at Wells Fargo Bank on May 31, 2024, two months before Bank of America sent Mega World the notice of acceleration. (Dkt. 1 at p. 10; Dkt. 1-13; Dkt. 1-14). However, two months later, on July 31, 2024—two days after Bank of America sent its notice of acceleration—Defendants provided bank statements to Bank of America showing that the balance in the Wells Fargo account had dwindled to less than $30,000.00. (Dkt. 1 at p. 10; Dkt. 1-13; Dkt. 1-15). Under the circumstances presented by this record, the disappearance of such a large amount of money in such a short time further convinces the Court that Bank of America will suffer irreparable harm if the Court does not enter preliminary injunctive relief to protect against dissipation of Bank of America's collateral. Bank of America has accordingly satisfied the second of the four equitable factors required to obtain preliminary injunctive relief.

**c. Relative weight of threatened harm**

Bank of America has clearly shown that the threat of harm it faces if its motion for a preliminary injunction is denied outweighs the threat of harm faced by Defendants if Bank of America's motion for a preliminary injunction is granted. The harm to Bank of America if no injunction issues is the possible dissipation of its collateral under circumstances indicating that loss of the collateral likely equates to loss of any recovery.

The harm to Defendants if an injunction issues, on the other hand, is simply the harm of being held to their contractual obligations under the RLOC and the security agreement.

Bank of America primarily wants this Court to require Defendants to preserve Bank of America's collateral and to permit Bank of America to inspect it—obligations that the RLOC and the security agreement impose on Mega World anyway, even if Defendants have not defaulted. (Dkt. 1 at pp. 16–17; Dkt. 44 at p. 2). Bank of America's additional request that the Court require Defendants "to immediately deliver to [Bank of America] possession of the Collateral" is more stringent, but it does not tilt this factor in favor of Defendants because Bank of America has presented such strong evidence of both default and possible dissipation of its collateral. (Dkt. 1 at p. 17).

Bank of America has satisfied the third of the four equitable factors required to obtain preliminary injunctive relief.

**d. The public interest**

Finally, Bank of America has clearly shown that granting its motion for a preliminary injunction will not disserve the public interest. To the contrary, granting Bank of America's motion would serve the public interest. Given the strength of the evidence of forgery and dishonesty that Bank of America has presented, along with the uncertainty regarding the status (or existence) of its collateral, the Court concludes that "[t]o risk dissipation of . . . the few assets potentially available to [Bank of America] before this case can be decided on its merits would substantially disserve the public interest." *Janvey v. Alguire*, No. 3:09-CV-724, 2010 WL 11619267, at *8 (N.D. Tex. June 10, 2010), *aff'd*, 647 F.3d 585 (5th Cir. 2011); *see also Barrett v. Reynolds*, No. 8:12-CV-328, 2012 WL

5569755, at *6 (D. Neb. Nov. 15, 2012) ("The public has a strong interest in ensuring that defendants do not fraudulently or otherwise transfer assets during litigation to circumvent recovery by a wronged plaintiff.") (quotation marks omitted).

Bank of America has satisfied the fourth of the four equitable factors required to obtain preliminary injunctive relief.

## IV. CONCLUSION

Accordingly, for all the reasons stated above, Bank of America's motion for a preliminary injunction (Dkt. 1 at pp. 15–17; Dkt. 44 at p. 2) is **GRANTED**. Defendants, and any third parties affiliated with or working in concert with Defendants, are **ORDERED** to provide Bank of America immediate access to the 2020 Trencor Trencher T16-60, Serial Number T16-187, and the 2022 Vermeer Drill D330X500, Serial Number 1VR450075E1099684, for inspection. Failure to comply with this order will result in sanctions for both Defendants and their counsel.

SIGNED at Houston, Texas on November 8, 2024.

George C. Hanks Jr

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE